We'll hear the next case, Edward v. Warden Kairos. Okay, good morning. May it please the court, this is Stephen Bergstein for the Plaintiff Appellant. One of the most dramatic things a trial judge can do is to overturn a jury verdict on evidentiary grounds, and that's what happened here. We're here to argue that the jury had an evidentiary basis to find that Warden Kairos knew that the plaintiff was exercising in full restraints for a period of six months. This court should therefore reinstate the verdict in plaintiff's favor. The district court overturned the verdict on the basis of the warden's personal knowledge. We would suggest that the evidence supports the jury's verdict for the following reasons. Number one, Kairos essentially testified at trial that he was the eyes and ears of the jail. The jury had a basis to find that the only a few phase one inmates in what we call the threes. And so how do we know this? Number one, the warden testified he was a hands-on administrator. He toured the facility twice a week. The warden testified, he insisted that he pays attention. Quote, I pay attention to my job and my responsibility. That testimony at page 183 of the record was in response to a question that suggested that the warden did not know how long AS phase one inmates such as the plaintiff are in the threes. And in response to that, he said, no, I pay attention to my job. He testified he closely monitored phase one inmates like plaintiffs. He testified he spoke to staff and inmates and even knew about their exercise routines. And he reviewed surveillance video, which included recreational areas. And in his oversight of the facility, he paid particular emphasis on new inmates who received initial phase one classifications. That would be the plaintiff. So under Farmer v. Brennan, we can draw from circumstantial evidence in determining whether a defendant has personal knowledge of a constitutional violation. And the jury here had a factual basis to reach a verdict in favor of plaintiff. There was a case decided by this court after we filed our briefs, McCrae v. Lee, which has some useful language on circumstantial evidence in the context of inmate exercise routines. And in McCrae 963 F. 3rd at page 119, this court found in reversing dismissal of the case that the defendants could have known about the lack of exercise at the jail in part because of their inherent awareness of conditions at the jail, such as being able to look out the window and seeing that there's a lot of snow on the ground and nobody's clearing the ice and snow. Yes. Can you remind me what the evidence was about in cell exercise? Yes. The in cell exercise involved a 12 by 7 foot cell. There's a bed, there's a desk, a chair, a sink, toilets, combination sink, toilet and a footlocker. So plaintiff testified he only did pushups and sit ups in the jail. He couldn't do anything more than that because he didn't want to antagonize the other inmates. He had hip dysplasia, which also limited his in cell exercise. So the jury was able to find based on the jury charge, which had a five factor test from Williams versus Gord. Case was called Williams from Judge Shineland. One of the factors can be the availability of in cell exercise. The jury was able to credit the plaintiff's testimony that he couldn't exercise enough in his own cell. And the five factors in the jury charge also included the availability of out of doors exercise. And the jury was able to give that particular element special consideration in its deliberations. And this court in the Greifinger case specifically pointed out that there's an eighth amendment right to out of cell exercise. So even if out of cell availability for exercise is not the only factor, the jury was allowed based on the multi-part test weighing the evidence that that was crucial in ruling in the plaintiff's favor. But the jury, as I said, also had a basis to find that opportunities for in cell exercise were not. I got that. I got that. So. So the other question I have, did the district court make a ruling on a motion for a new trial, which he can do at the time that he enters the JNOB? He did not. I'm just looking at the opinion now. I think it was just rule 50. Not. Oh, yeah. On the rule 59. Yeah. So. So if we were to agree with you, it would go back. He would have an opportunity to to to address that motion. Correct. Yeah. OK. OK. I assume that would include the size of the jury verdict, but that's probably an issue for the district court in the first place. Right. I understand. Finally, although the district court didn't reach this issue, there was. A basis for the jury to find that the jail had feasible options to allow plaintiff to exercise without restraints. It was testimony that plaintiff was offered the opportunity to transfer to the ones where he could exercise out of restraints. And there was a dispute about this, but the plaintiff said, yes, he requested it and no, he didn't turn down the offer when it was made to him. There was also testimony about options that were available to the jail, such as adding an internal chain link door with traps to the recreation area so you can remove restraints safely, adding traps to the main door and the threes, individual recreational enclosures and the recreation yards. These were options for the jail. This court said in griping her cost considerations cannot be a factor when you're dealing with constitutional rights such as these. Let me let me let me ask you if I could. In your brief, in the opening brief, you discuss the qualified immunity and the objective element. What's your argument? How do you respond to the view that we shouldn't reach those issues, but should let the district court resolve them on remand? Assuming, arguendo, we agree with you on the personal involvement issue. So the question is, which court should decide qualified immunity? I've seen it go both ways in this court and the objective element. In other words, why not give the district court the opportunity to resolve on remand? Sure, I would argue the same arguments I'm making here that this court has settled law going back decades that out of doors exercises necessary under the Eighth Amendment. And courts are still saying that. And I'm confident that whatever court takes up that issue, we will prevail on the qualified immunity question. So did you go ahead? Go ahead. No, no. Finish your question. Beyond the fact that that Kiros was a hands on warden who toured the facility twice a week, talked to prisoners, reviewed the video footage. What is your strongest case that he was aware of all this? Well, I cited McCrae versus Lee, which talks about circumstantial evidence and the inherent awareness that prison administrators have of the facility that's number one. Farmer versus Brennan, when the conditions are obvious, you can draw the inference that prison officials know there's a constitutional violation. You know, Kiros knew that phase one inmates in the freeze were exercising shackles. When he arrived at Northern, he came to understand this. He knew that overflow inmates like plaintiff would be sent to the threes where they had to exercise full restraint. He upheld the policy to that effect. He didn't pursue measures to ensure that inmates can have meaningful exercise out of doors. And he also knew that overflow inmates like plaintiff could be in the ones could could could could be in the freeze for up to two years. So he knew that. Well, wait a second. It wasn't a testimony that the normal course was that people transferred out of the ones and into the out of the threes and back into the ones in rather short order. That can happen. But he said at page 227 of the appendix, it could be up to two years. And if there's overflow, you don't know how long they can stay. And you can't be certain that an overflow inmate like plaintiff is going to be in the threes for two weeks. You know, they could be there much longer. So up to two years. What did he do about it? How was the jury charged on the knowledge element? Did plaintiff sum up on the arguing that he knew or should have known from very early on, given his activity and his being around and knowing what's going on in prison should have known from early on what was going on with Edwards and that and he either wasn't actually was aware or should have been aware of the fact that this went on for five and a half months. Is that how it was? Is that how it was argued to the jury? And what did the judge charge the jury in that regard? Well, I'm looking at the summation. I'm pretty sure I didn't try the case, but I'm pretty sure that came up in summation because that was that was carefully developed a trial about Kairos's awareness of overflow and out of doors exercise. So I'm just looking through the summation now and I know it didn't come up in the state's brief, so I didn't have an opportunity. So Edwards didn't try and... Edwards, was there any attempt to conscribe only from the point of time where he complained and then the warden did something about it? The question is, did summation focus on how long Kairos knew? It must have, but I'm just going through it now. Okay. And but that was emphasized a trial, but on the issue of Kairos's knowledge, I'm just going through the jury charge now. Um, you can, you can look at it while your adversary is speaking and... I'll do that. I can do that. We'll now hear from your, uh, your, uh, your adversary, Mr. Barry. Good morning. May it please the court. My name is Stephen Barry, Assistant Attorney General for the state of Connecticut representing Warden Angel Kairos. Judge Underhill conducted the trial over two days and surely scoured the transcript and correctly held that Warden Kairos did not know that the plaintiff was recreating in restraints until March 8th, 2011. And he responded by approving the plaintiff's move to phase two, where exercise restrictions were removed. The following facts are undisputed and uncontested. Northern Correctional Institution in late 2010, 2011 was an extremely volatile prison environment called the most volatile time in the history of that maximum security prison. The plaintiff acknowledges this in his testimony as well. Northern was housing the most dangerous inmates in the DO system at the time, AS Phase I inmates and the SRG STM inmates who were the gang, active gang members. AS Phase I inmates were considered the most dangerous. The facility was at full capacity, over 400 inmates. And it is in that volatile environment and time where Angel Kairos was warden. And it's that facility and environment that the plaintiff entered in September 2010 as an AS Phase I inmate as a result of his violent, unprovoked assault on a corrections officer for which he was ultimately convicted. Northern had six housing units, one east, one west, two east, two west, three east, and three west. The ones were the most restrictive units and the three is the least restrictive units in the recreation yards that were divided into three secure individual recreation areas. Those areas had trap doors that permitted removal of hand and leg restraints that was required for out-of-cell movement of AS Phase I inmates based on their recent history of violence. However, because the one units in Northern were at maximum capacity, some incoming AS Phase I inmates were designated as overflow. The practice that overflow of Phase I inmates would be temporarily housed in three east or three west until space became available. So uncontested that this was meant to be a very temporal or temporary situation. Testimony was that... Yes. Okay, counselor. Yeah, you had two minutes uninterrupted. So I wanted to just ask something. Okay. What do you mean by temporary? In other words, I take it that what you're saying is that the people, the overflow Phase I people who are going to be put in Unit 3 were going to be put over there only for short periods of time, right? Correct. That's the idea. Correct. No, I think the policy was up to two weeks or something of that sort. And so they would rotate them. That's how they dealt with the overflow. They would rotate people over to three and then in two weeks and then somebody else would come out and they do that. And at any given time, my understanding is during this period, there were three or four inmates in three who were Phase I inmates about during this time. I think there was testimony to that fact. Is that right? That is correct. And those inmates would typically cycle back over to the ones as soon as space became available. And that was a constant process. Now, there's no dispute that that policy was not implemented with respect to Edward. Is that right? That is correct. He stayed in that unit for obviously the full six-month period and the testimony was there. Okay. So then the standard we have to do, we have to decide here is because this was a Rule 50 motion, whether there was sufficient evidence. It's not whether we think that the jury should have, that the judge was just correct. It's whether or not a reasonable jury under the circumstances would have insufficient evidence to conclude that the Quiros knew of Edward's presence in Unit 3 in shackles at exercising, whether the jury could reach that conclusion based upon the evidence before it. That's the test, right? That is the test. Okay. So then we need to look at his knowledge, which I think is the contestant, his knowledge of what the situation was prior to March of 2011 during the period of time he was in there. And your adversary has pointed to certain evidence that he was asked at one point, you have no way of knowing, do you, how long a person would be in the Unit 3 overflow and Quiros said, that's incorrect. I pay close attention to the job and I tour the place twice a week. That was his answer. No way of knowing, no, I did have a way of knowing and this was it. And then the other thing is he also testified that there were three or four inmates at any one time in Unit 3 during the time we're talking about. And he also said that he was carefully reviewed the surveillance videos of Unit 3. And so all of that is in the record. Why isn't that evidence sufficient for a jury to conclude that he had knowledge of Edward's situation for the full six months or five months after he got out of solitary at the beginning, that he was over in Unit 3 for a jury to decide? I mean, you know, not whether we would give way to it, but whether there was sufficient evidence for a jury to do it. Understood, Your Honor. And the reason is threefold. First, what Warden Quiros said was because I have, because I tour twice a week, that is the opportunity for me to talk to folks and get information if someone has any issues. And the plaintiff acknowledged that he did not raise any issue with Warden Quiros until March 8, 2011. Further, there is a grievance. That's not, he may have been over there for multiple reasons and he may not have been paying close attention to what was going on or just didn't care. I don't know. But the test here is deliberate indifference. And he, there was, wasn't there sufficient evidence when he said, it's incorrect. I did have a way of knowing how long a person was in the Unit 3 overflow. That was his testimony. And Your Honor. Why can't the jury rely on it, regardless of the fact that he had another motive? Because the standard is one of recklessness, not merely negligence. And what Quiros testified was that he had access to video, did not testify that he had carefully reviewed video or had seen video of the plaintiff in the threes. There was a grievance process set up so that he could be He denied that he saw the defendant in the videos or knew that the defendant was there. That testimony before the jury, that the jury would be free. We have to assume that the jury rejected. There was no evidence that he saw video in the threes ever. The testimony was that there video cameras throughout the facility, and that he has access to those. And that's the extent of the evidence. I thought there was testimony that he reviewed the videos, that that was part of his hands on work at the prison. He was careful about that. And my review of the record is that that was not the case, Your Honor. What's curious to me is that Judge Underhill seems to have seized on the complaint that Mr. Edwards made and then looks upon this as a period of 16 days. This is Special Attendant 7. But then what he also says, and I ask you to address this, this follows along with Judge Underhill, that Kuros had personal involvement, or excuse me, Edwards contends that Kuros had personal involvement in any restriction on his right to access. And then he says, but that, but that was only limited for 19 days. And then he says, and this is at the bottom of page seven, Special Attendant 7. In response, Edwards asserts that the record fully supports the jury's finding. But he only cites this. He says that Kuros had the authority to allow Edwards to recreate in the threes without restraints. The staff did not regard Edwards as a serious threat, and therefore Kuros's failure to allow Edwards to exercise without restraints was objectively unreasonable. It doesn't say anything about the other evidence that your opponent cited to us about Kuros's assertion. Well, I knew what was going on. I saw, I knew what was going on all the time in my facility. And couldn't the jury hear that and say, well, geez, if he knew what was going on, then he knew that this guy was shackled with his arms behind his back and his legs were shackled. And, and that seems cruel and unusual. And that if he, and his assertions that he didn't know about it ring hollow. But, but the, but the district court in saying that there was no evidence doesn't even mention that. Is your opponent mischaracterizing the record or did you? Let me finish. Did Kuros actually say these things in front of the jury? Did the jury get to hear Kuros's assertion that he knew what was going on in his facility? He said that he knew what was going on in the facility and the way he tours. And that's how he ascertains what's happening. He's able to talk to folks at the facility. Are you saying that then a jury could not make a conclusion that he knew that they, that he knew or that he should have known that this was the way Mr. Edwards was recreating for six months? Your Honor, I think it's important to look also temporarily as what was going on here at the time. The standard is that there's no evidence to support the jury's finding. And I just asked you now, given what you've just told me, is that are you telling me that a jury could not rationally conclude that Kuros actually did know they concluded that he did know or that he should have known that this fellow was restrained in this way for six and a half months when he recreated? Your Honor, I do think there is not sufficient evidence to establish that Kuros was criminal, was reckless here. I just want to echo Judge Walker and Judge Wesley. Even if there is no direct evidence and only circumstantial evidence that Kuros was aware that Edwards was being recreated and restrained for six months, shouldn't that be, isn't that enough? I mean, it's the province of the jury to draw reasonable inferences from circumstantial evidence. It's not what we think if we were the jury, but why isn't it the province of the jury? Because the evidence as presented, again, was simply not sufficient to establish that Kuros here was reckless. If Kuros had not toured, if he set up this process and tried to essentially, Kuros said that that process is set up so that I can, and the plaintiff acknowledges that. He acknowledges that he affirmatively did not raise that. The law is not that the inmate has to complain that he's being treated untimely, is it? It is not, but that... Let's be clear. Then Judge Underhill, by timing, by doing the timing based upon the complaint, mistakes the law. I mean, well, I take that. That's not fair to Judge Underhill. Judge Underhill measured the constitutional deprivation from the time of the complaint, that being a time when he knew Kuros knew, and we've got some case law that's favorable to Kuros in that regard, that's for certain, but if the time period is six months and Kuros knew, the absence of a complaint does not absolve Kuros of an Eighth Amendment violation, does it? No, but again... Okay. Let me ask you this. On the objective element, which of course the district court didn't reach, you say on several occasions that Edwards could perform push-ups inside his cell, but what's the relevance of that? The controlling decision of Williams describes the right at issue as one to out-of-cell exercise, and there was no indication that the plaintiff there could not exercise in his cell, and there wasn't any such indication on a similar issue in McRae, where we also held in the plaintiff's favor on the issue of qualified immunity. The issue of out-of-cell exercise has been reviewed, and no court has said outright that there is a right to out-of-cell exercise. It has to be viewed in the context of the factors set how the district court looked at that. I believe the issue of out-of-cell exercise was a footnote in that Williams case, describing the law in other circuits. So up until that had not been established, and district courts have since then have looked at it in that fashion, using the test of the duration of the deprivation, whether there's an opportunity for in-cell exercise or other out-of-cell exercise, and the nature of the deprivation. For example, in the McRae case, that was obvious to anyone walking through a facility, and it was in the context of a motion to dismiss. It was obvious to anyone that what was happening there was they weren't removing snow at all from the recreation yard for an entire winter. So you obviously knew as a warden that snow wasn't being removed from a cell. That's vastly different than realizing that someone in your facility has been in an overflow status. When there is a unit manager and a deputy warden who are in charge of managing that program, and in this case, it would be the unit manager. How do you respond to the argument that effectively the qualified immunity issue in this case was decided in this court's earlier summary order in Edwards versus Arnon? Your Honor, that issue, certainly it was in a different posture. It was in the context of a motion. We do not reach several questions. The very last paragraph of the decision talks about we're not reaching some of the factual questions at that point. At this point, the court has a full record from which to make a decision. Under that full record, and given the facts that were brought out at trial, that would be an entirely different procedural posture at this point. Thank you. We'll now hear two minutes from Mr. Bergsten in rebuttal. Yes. Four points. In Edwards 1, that was 2015, the only way this court framed the issue was the Eighth Amendment requires that prison inmates be allowed some out-of-cell exercise, citing the Greifinger case. The final paragraph of Edwards 1 doesn't talk about the other factors that were actually part of the jury charge in this case. The jury charge in this case on state of mind is page 542 and 543 of the appendix. It looks like it's drawn from Farmer v. Brennan about circumstantial evidence, things of that nature, as well as deliberate indifference. In summation, plaintiff's counsel at page 605 of the joint appendix did allude to the warden's state of mind. Finally, there was a colloquy about video surveillance and what was available to the warden at page 127, 128. There was video surveillance of the exercise or the recreation areas in the threes, which the warden had access to. For these reasons, this court should reinstate the jury charge. Thank you. Thank you both. Well argued. The court will reserve decision. We'll go to the final case on the calendar.